<span style="color:red">**EXHIBIT A**</span>

**CIRCUIT COURT OF JEFFERSON COUNTY**
**STATE OF MISSOURI**

STATE OF MISSOURI, ex rel. ERIC S.
SCHMITT, ATTORNEY GENERAL;

      Plaintiffs,

  v.

CONSUMER LAW PROTECTION, LLC, a
Missouri limited liability company;

Serve at:
c/o CT Corporation System (Reg. Agent)
120 S. Central Ave.
Clayton, MO 63105

CONSUMER RIGHTS COUNCIL, a Missouri
nonprofit corporation;

Serve at:
c/o CT Corporation System (Reg. Agent)
120 S. Central Ave.
Clayton, MO 63105

PREMIER RESERVATIONS GROUP, LLC, a
Missouri limited liability company;

Serve at:
c/o CT Corporation System (Reg. Agent)
120 S. Central Ave.
Clayton, MO 63105

RESORT TRANSFER GROUP, LLC, a Missouri
limited liability company, also doing business as
CONSUMER LAW PROTECTION LAWYERS;

Serve at:
c/o CT Corporation System (Reg. Agent)
120 S. Central Ave.
Clayton, MO 63105

Case No. _____

SQUARE ONE DEVELOPMENT GROUP, INC., a
Missouri corporation, also doing business as
SQUARE ONE GROUP;

Serve at:
c/o CT Corporation System (Reg. Agent)
120 S. Central Ave.
Clayton, MO 63105

SQUARE ONE GROUP, LLC, a Missouri limited
liability company;

Serve at:
c/o CT Corporation System (Reg. Agent)
120 S. Central Ave.
Clayton, MO 63105

TIMESHARE HELP SOURCE, a Colorado limited
liability company;

Serve at:
c/o Matthew Titus
1610 Des Peres Rd.
Suite 150
St. Louis, MO 63131

CHRISTOPHER CARROLL, individually, and as an
owner, officer, director, member, and/or manager of
Consumer Law Protection, LLC, Consumer Rights
Council, Premier Reservations Group, LLC, Resort
Transfer Group, LLC, Square One Development
Group, Inc., Square One Group, LLC, Timeshare
Help Source, Whiskey Dix Big Truck Repairs LLC,
Square One Transport LLC, and Square One
Logistics LLC;

Serve at:
1157 Highway AA
Farmington, MO 63640

GEORGE REED, individually, and as an owner,
officer, director, member, and or/manager of
Consumer Law Protection, LLC, Consumer Rights
Council, Premier Reservations Group, LLC, Resort
Transfer Group, LLC, Square One Development
Group, Inc., Square One Group, LLC, Timeshare

2

Help Source, Whiskey Dix Big Truck Repairs LLC,
Square One Transport LLC, and Square One
Logistics LLC;

Serve at:
33 Greenfield Dr.
Defiance, MO 63341

LOUANN REED, individually, and as an owner,
officer, director, member, and/or manager of
Consumer Law Protection, LLC, Consumer Rights
Council, Premier Reservations Group, LLC, Resort
Transfer Group, LLC, Square One Development
Group, Inc., Square One Group, LLC, and Timeshare
Help Source;

Serve at:
33 Greenfield Dr.
Defiance, MO 63341

SCOTT JACKSON, individually, and as an owner,
officer, director, member, and/or manager of
Consumer Law Protection, LLC, Consumer Rights
Council, Premier Reservations Group, LLC, Resort
Transfer Group, LLC, Square One Development
Group, Inc., Square One Group, LLC, and Timeshare
Help Source;

Serve at:
814 East Romeo Court
Nixa, MO 65714

EDUARDO BALDERAS, individually, and as an
owner, officer, director, member, and/or manager of
Consumer Law Protection, LLC, Consumer Rights
Council, Premier Reservations Group, LLC, Resort
Transfer Group, LLC, Square One Development
Group, Inc., Square One Group, LLC, and Timeshare
Help Source;

Serve at:
7634 Mission Point
Boerne, TX 78015

WHISKEY DIX BIG TRUCK REPAIR LLC, a
Missouri limited liability company;

Serve at:
c/o CT Corporation System (Reg. Agent)
120 S. Central Ave.
Clayton, MO 63105

SQUARE ONE TRANSPORT LLC, a Missouri
limited liability company;

Serve at:
c/o CT Corporation System (Reg. Agent)
120 S. Central Ave.
Clayton, MO 63105

SQUARE ONE LOGISTICS LLC, a Missouri
limited liability company;

Serve at:
c/o CT Corporation System (Reg. Agent)
120 S. Central Ave.
Clayton, MO 63105

     Defendants.

_____

## **PETITION**

Plaintiff State of Missouri, *ex rel.* Eric S. Schmitt, in his official capacity as Missouri

Attorney General, brings this action under the Missouri Merchandising Practices Act, §407.010,

RSMo., *et seq.*, to obtain temporary, preliminary, and permanent injunctive relief, restitution,

civil penalties, and other equitable relief, and alleges:

## **SUMMARY OF THE CASE**

1.    Since 2018, Defendants[1] have operated a fraudulent timeshare exit scheme that

primarily targets older adults across the U.S.

---

[1] Unless otherwise specified, "Defendants" as used in this Petition does not include Whiskey Dix Big Truck Repair LLC, Square One Transport LLC, and Square One Logistics LLC. Plaintiff does not currently allege that those entities were engaged in the prohibited conduct alleged herein, but rather that they received, via fraudulent transfers prohibited under §428.024, RSMo, funds that the other Defendants received from consumers via such conduct.

4

2.      Through direct mail campaigns and cold-call telemarketing, Defendants lure consumers to high-pressure sales presentations that they hold at local hotels and restaurants. These presentations contain myriad falsehoods, misrepresentations, and unfair practices designed to induce consumers to agree to pay Defendants thousands—or tens of thousands—of dollars Defendants ultimately cannot or will not perform.

3.      During the sales presentation, Defendants first attempt to gain consumers' trust by falsely representing that they are working for, or affiliated with, reputable timeshare exchanges and developers and are one of the few "authorized" or accredited timeshare exit companies. In truth, Defendants are not affiliated with these timeshare exchanges and developers at all.

4.      Defendants then use a series of tactics to convince consumers that they need to act immediately or be stuck with their timeshares forever.  For example, Defendants tell consumers that timeshare developers will start raising maintenance fees exponentially and perpetually. Defendants also falsely tell consumers that unless they get rid of their timeshare, their children and grandchildren will be responsible for the skyrocketing maintenance fees in perpetuity.

5.      Having stoked consumers' fears and created a sense of urgency, Defendants offer, for an exorbitant upfront fee, to get consumers out of their timeshares—but only if the consumers sign a contract with Defendants right then and there.

6.      To allay consumer concerns, Defendants represent that they will accomplish this within a specified time, or they will fully refund the upfront fee.

7.      Even where consumers do not wish to purchase Defendants' services, Defendants resort to using undue influence and strong-arm tactics in order to make a sale. If a consumer tries to leave Defendants' presentation, Defendants' salespeople bodily stop them from leaving the room, and in some cases will not let them leave until the consumer signs a contract.

Electronically Filed - Jefferson - June 09, 2022 - 11:40 AM

8.    But Defendants' promises to get consumers out of their timeshare contracts within a specified time or provide a full refund are false or unsubstantiated. Rarely are Defendants able to successfully get consumers out of their timeshares at all, let alone within the represented time. When consumers complain, Defendants make a series of false representations designed to make it seem like they are taking steps to get consumers out of their timeshare contracts. In reality, Defendants are simply buying more time to keep their scheme from being discovered. If consumers continue to complain, Defendants refuse to issue the promised refunds.

9.    As part of their scheme, Defendants also regularly engage in other illegal practices, including failing to inform consumers that they have three business days in which to cancel the contract, affirmatively misrepresenting to consumers that there is no cancellation period, and failing to honor cancellation requests that are made within three business days as required by the Federal Trade Commission's Cooling-Off Rule.

10.   Plaintiff has received reports from nearly 200 consumers who Defendants have scammed out of more than $2 million. Plaintiff believes there are hundreds—or even thousands—of other consumers who have suffered from Defendants' deceptive and unfair practices. The identities of all of Defendants' victims are solely in Defendants' possession. Accordingly, discovery is required in order to determine the total number of victims and total amount of restitution owed.

## JURISDICTION AND VENUE

11.   This Court has subject matter jurisdiction pursuant to Article V, §14 of the Missouri Constitution.

12.   This Court has personal jurisdiction over Defendants, because Defendants reside in the State of Missouri and conduct business in the State of Missouri.

13.   This Court has authority over this action pursuant to §407.100, RSMo, which

6

allows the Attorney General to seek injunctive relief, penalties, and other relief in circuit court against persons who violate §407.020, RSMo.

14.     Venue is proper in this Court pursuant to §407.100.7, RSMo, because the violations alleged herein occurred, among other places, in Jefferson County.

15.     Venue also is proper in this Court because Defendant Consumer Law Protection, LLC has entered into contracts with consumers specifying that any disputes under said contracts shall litigated "in the circuit courts of Jefferson County, Missouri.

**PARTIES**

16.     Plaintiff **State of Missouri,** *ex rel.* Eric S. Schmitt, in his official capacity as Missouri Attorney General, is authorized to bring this action and to obtain injunctive relief, consumer restitution, civil penalties, costs, and all other just and proper relief pursuant to the Missouri Merchandising Practices Act §§407.020 and 407.100, RSMo.

**Corporate Defendants**

17.     Defendant **Consumer Law Protection, LLC**, ("CLP") is a Missouri limited liability company with its principal place of business at 1610 Des Peres Road, Suite 150, St. Louis, Missouri 63131. From its headquarters in Missouri, CLP transacts or has transacted business in this state and throughout the United States. At all times relevant to this Petition, acting alone or in concert with others, CLP has advertised, marketed, distributed, or sold timeshare exit services to consumers throughout the United States.

18.     Defendant **Consumer Rights Council**, ("CRC") is registered as a Missouri nonprofit corporation with its principal place of business at 8600 Daniel Dunkin Drive, Pevely, Missouri 63070. Notwithstanding that CRC is registered as a Missouri nonprofit, CRC is organized to carry on business for its own profit, for that of its members, or for the Corporate Defendants within the meaning of Section 4 of the FTC Act. CRC transacts or has transacted

7

business in this state and throughout the United States. At all times relevant to this Complaint, acting alone or in concert with others, CRC has advertised, marketed, distributed, or sold timeshare exit services to consumers throughout the United States.

19. Defendant **Premier Reservations Group, LLC**, ("PRG") is a Missouri limited liability company with its principal place of business at 1610 Des Peres Road, Suite 150, St. Louis, Missouri 63131. From its headquarters in Missouri, PRG transacts or has transacted business in this state and throughout the United States. At all times relevant to this Complaint, acting alone or in concert with others, PRG has advertised, marketed, distributed, or sold timeshare exit services to consumers throughout the United States.

20. Defendant **Resort Transfer Group, LLC**, also doing business as Consumer Law Protection Lawyers ("RTG"), is a Missouri limited liability company with its principal place of business at 1610 Des Peres Road, Suite 150, St. Louis, Missouri 63131. From its headquarters in Missouri, RTG transacts or has transacted business in this state and throughout the United States. At all times relevant to this Complaint, acting alone or in concert with others, RTG has advertised, marketed, distributed, or sold timeshare exit services to consumers throughout the United States.

21. Defendant **Square One Development Group, Inc.**, also doing business as Square One Group ("SODG"), is a Missouri corporation with its principal place of business at 1610 Des Peres Road, Suite 150, St. Louis, Missouri 63131. From its headquarters in Missouri, SODG transacts or has transacted business in this state and throughout the United States. At all times relevant to this Complaint, acting alone or in concert with others, SODG has advertised, marketed, distributed, or sold timeshare exit services to consumers throughout the United States.

22. Defendant **Square One Group, LLC** ("SOG"), is a Missouri limited liability

8

company with its principal place of business at 1610 Des Peres Road, Suite 150, St. Louis, Missouri 63131. From its headquarters in Missouri, SOG transacts or has transacted business in this state and throughout the United States. At all times relevant to this Complaint, acting alone or in concert with others, SOG has advertised, marketed, distributed, or sold timeshare exit services to consumers throughout the United States.

23. Defendant **Timeshare Help Source** ("THS") is a Colorado limited liability company with its principal place of business at 525 N. Cascade Avenue, Colorado Springs, Colorado 80903. THS transacts or has transacted business in this state and throughout the United States. At all times relevant to this Complaint, acting alone or in concert with others, THS has advertised, marketed, distributed, or sold timeshare exit services to consumers throughout the United States.

## Individual Defendants

24. Defendant **Christopher Carroll** is or has been an owner, officer, director, member, and/or manager of Corporate Defendants. At all times relevant to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint. Defendant Carroll is listed on corporate documents as President and CEO of Square One Group. He is a signatory on Corporate Defendants' bank accounts. Defendant Carroll has participated in timeshare exit sales presentations and has communicated with consumers about their timeshares. Defendant Carroll regularly is present at Corporate Defendants' business premises, hires employees, and directs day-to-day business operations. Defendant Carroll resides in this state and, in connection with the matters alleged herein, transacts, or has transacted business in this state and throughout the United States.

25. Defendant **George Reed** is or has been an owner, officer, director, member,

9

and/or manager of Corporate Defendants. At all times material to this Complaint, acting alone or in concert with others, Defendant George Reed has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint. He is a signatory on Corporate Defendants' bank accounts. He is regularly present at Corporate Defendants' business premises, hires employees, and directs day-to-day business operations. Defendant George Reed resides in this state, and in connection with the matters alleged herein, transacts, or has transacted business in this state and throughout the United States.

26. Defendant **LouAnn Reed** is or has been an owner, officer, director, member, and/or manager of Corporate Defendants. At all times material to this Complaint, acting alone or in concert with others, Defendant LouAnn Reed has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint. Defendant LouAnn Reed maintains the title of President, Secretary, and Director of SODG. She is a signatory on Corporate Defendants' bank accounts. Defendant LouAnn Reed resides in this state, and in connection with the matters alleged herein, transacts, or has transacted business in this state and throughout the United States.

27. Defendant **Scott Jackson** is or has been an owner, officer, director, member, and/or manager of Corporate Defendants. At all times relevant to this Complaint, acting alone or in concert with others, Defendant Jackson has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint. Defendant Jackson maintains the title of Director and Vice President of Sales for the Corporate Defendants. Defendant Jackson manages sales teams and is regularly present at timeshare exit sales presentations with consumers. Defendant Jackson regularly is present at Corporate Defendants' business premises and directs day-to-day business operations. He routinely responds to consumer

10

Electronically Filed - Jefferson - June 09, 2022 - 11:40 AM

complaints. Defendant Jackson resides in this state, and in connection with the matters alleged herein, transacts, or has transacted business in this state and throughout the United States.

28.     Defendant **Eduardo Balderas** is or has been an owner, officer, director, member and/or manager of Corporate Defendants. At all times relevant to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint. Defendant Balderas maintains the title of Director and Vice President of the Corporate Defendants. He manages sales teams and frequently is present at timeshare exit sales presentations. Defendant Balderas routinely delivers initial group presentations at the start of sales meetings with consumers. He also assists directly in selling timeshare exit services to consumers. Defendant Balderas regularly responds to consumer complaints. Defendant Balderas resides in this state, and in connection with the matters alleged herein, transacts, or has transacted business in this state and throughout the United States.

<u>**Fraudulent Transfer Defendants**</u>

29.     Defendant Whiskey Dix Big Truck Repair LLC ("Whiskey Dix") is a Missouri limited liability company with its principal place of business at 380 Landon Road, Bourbon, Missouri 65441.

30.     Defendant Square One Transport LLC ("SO Transport") is a Missouri limited liability company wit its principal place of business at 380 Landon Road, Bourbon, Missouri 65441.

31.     Defendant Square One Logistics LLC ("SO Logistics") is a Missouri limited liability company with its principal place of business at 86 Landon Road, Bourbon, Missouri 65441.

## COMMON ENTERPRISE

32.     Corporate Defendants have operated as a common enterprise while engaging in the deceptive, unfair, and unlawful acts and practices alleged below.

33.     Corporate Defendants have conducted the business practices described below through an interrelated network of companies that have common ownership, officers, managers, business functions, employees, and office locations, and that have commingled funds.

34.     Because Corporate Defendants have operated as a common enterprise, each of them is jointly and severally liable for the acts and practices alleged below.

## TRADE OR COMMERCE

35.     At all times relevant to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in §407.010(7), RSMo.

## DEFENDANTS' BUSINESS ACTIVITIES

36.     Since 2018, Defendants have engaged in a scheme to sell bogus timeshare exit services through direct mail campaigns and in-person sales presentations to consumers throughout the United States.

37.     Defendants charge consumers thousands (or tens of thousands) of dollars in exchange for releasing timeshare owners from their timeshare, ostensibly saving the consumers from future timeshare maintenance fees, mortgage payments, and other fees.

38.     In reality, Defendant rarely provide the services they claim they will provide.

39.     Defendants' scheme has three phases: the advertising phase, the sales presentation phase, and the "exit" phase.

40.     In the advertising phase, Defendants send target flyers through the mail, or else cold-call consumers directly, requesting that they come to a "presentation" at a nearby hotel or restaurant.

12

41.     Defendants entice consumers with the prospect of a free meal, and sometimes with a "gift" like a gift card or smart tablet. Defendants claim there is no obligation to purchase any services.

42.     Defendants also make a series of false representation about their services, described below, to entice timeshare owners to attend their presentation.

43.     The presentation phase occurs when timeshare owners attend the "free lunch" Defendants had advertised.

44.     In the presentation phase, Defendants make a series of false and deceptive statements designed to scare and intimidate consumers into paying thousands (or tens of thousands) of dollars for their services.

45.     Defendants also use duress and undue influence to pressure consumers into buying their services even when consumers would rather not.

46.     The "exit" phase occurs after consumers sign up for Defendants' services. During this phase, Defendants ostensibly are working to "exit" owners from their timeshares.

47.     In reality, Defendants are rarely able to provide the exit services they promised. Instead, Defendants take steps to conceal their deceptive and unscrupulous conduct.

48.     The net result of Defendants' scheme is that they have bilked timeshare owners—who are typically elderly—out of millions of dollars.

## THE ADVERTISING PHASE

49.     In order to entice consumers to attend their in-person presentations, Defendants mail out flyers promising a "free lunch" with "no obligation" so that consumers can "learn how to gracefully exit out of [their] timeshare or maximize [their] investment." *See* Figures 1 and 2.

13

*Figure 1*



*Figure 2*

50.     Defendants also often promise an added bonus, such as a gift card or smart tablet, if consumers attend the presentation, and claim that consumers can "learn how to recover 100% of [their] timeshare's full purchase price." *See* Figure 3.

14



*Figure 3*

51.    Contrary to Defendants' representations, however, consumers who purchase Defendants' services do not recover 100%—or even 1%—of their timeshare's purchase price. In fact, the most consumers can hope for after paying Defendants thousands (or tens of thousands) of dollars is to simply no longer own a timeshare they already had spent considerable amounts of money to purchase.

52.    Defendants also fail to provide the additional gift (*i.e.*, gift card or tablet) mentioned in their flyers.

53.    Defendants claim to be "experts" in timeshare exit services, including both in their mailed flyers and on their websites.

54.    Defendants' flyers claim that consumers unable to attend the in-person presentation can arrange to consult Defendants' "experts" by phone or video. *See* Figure 4.

15

Electronically Filed - Jefferson - June 09, 2022 - 11:40 AM



*Figure 4*

55.     SOG's website states that it "has been in business since 2005, providing outstanding client services and property solutions from its Midwest headquarters in St. Louis MO. The Company added Time Share Exit services in 2018 to it's [*sic*] other portfolio of services."

56.     In truth, while SOG was formed in or about 2005, it was created to own and operate a string of massage parlors, which had nothing to do with "property services."

57.     SOG's website also claims it has a team of "experienced timeshare specialists," and directs consumers to contact it for "Expert Help." *See* Figures 5 and 6.

Electronically Filed - Jefferson - June 09, 2022 - 11:40 AM



*Figure 5*

*Figure 6*

58.     In truth, when Defendants began selling timeshare exit services in 2018, they had

no idea how to actually get a timeshare owner out of their timeshare.

59.     Defendants' advertisements also claimed they were "accredited" by the Consumer Rights Council. Defendants represent that Consumer Rights Council is "an independent advocacy organization dedicated to helping timeshare owners who are looking to safely cancel or exit their timeshares or simply learn how to improve their ownership experience." *See* Figure 2, *supra*.

60.     This representation is false. Consumer Rights Council is not an independent advocacy organization. It is a sham nonprofit corporation set up by Defendants for the sole purpose of making Defendants' sales activities appear legitimate.

61.     In truth, Consumer Rights Council has no accreditation authority and has not purported to accredit anyone except Defendants.

## THE PRESENTATION PHASE

62.     Defendants' in-person presentations are replete with falsehoods, and are designed to scare and intimidate consumers into purchasing Defendants' timeshare exit services, whether consumers want to or not.

63.     Consumers who attend Defendants' presentations are subjected to hours-long sessions designed to convince them to pay Defendants thousands of dollars to help them get out of their timeshares.

64.     Most of the consumers who attend Defendants' presentations are seniors. Defendants have conducted these presentations in Missouri and other states across the U.S.

65.     Defendants' in-person sales presentations begin with a group presentation of approximately 40 minutes, followed by individual meetings with Defendants' sales personnel.

66.     Defendants' sales pitch often will continue for hours until consumers agree to purchase Defendants' timeshare exit services.

18

67.     In some cases, Defendants literally will not let elderly consumers leave unless and until they agree to pay Defendants thousands (or tens of thousands) of dollars.

**Defendants' Group Presentation**

68.     As noted above, the first part of Defendants'' sales pitch is a group presentation.

69.     Defendants typically begin the group presentation by displaying the logos of entities such as RCI, LLC, Interval International, Wyndham Destinations, Bluegreen Vacations Unlimited, Inc., the American Resort Development Association, and the Better Business Bureau, representing that Defendants are "Proud Partners" of these organizations, or are accredited by them.

70.     But Defendants are not partners with, affiliates of, or otherwise representatives of any of these organizations. Nor are Defendants accredited by any of these companies or organizations.

71.     As in their flyer, Defendants continue to claim in the group sales presentation to be accredited by the Consumer Rights Council or CRC.

72.     They even go so far as to show a slide that purports to explain, "How we keep our CRC accreditation." *See* Figure 7.

Electronically Filed - Jefferson - June 09, 2022 - 11:40 AM



*Figure 7*

73.     As noted above, this is simply a ruse—Consumer Rights Council is not an independent organization, but a sham nonprofit set up and controlled by Defendants. The touted accreditation is meaningless.

74.     Consumer Law Protection also represents to consumers that it is a law firm. This is false. There formerly was a law firm doing business under the name "Consumer Law Protection." The former owners sold the business to other Defendants. Defendants now use the name "Consumer Law Protection" as a means of giving consumers a false impression of legitimacy and competence.

75.     After making a series of false claims to lend false claims to lend an air of legitimacy to their operations, Defendants then stoke consumers' fears by telling them that the timeshare industry has been working against them to pass legislation that will limit their ability to exit their timeshares and will cause annual maintenance fees to increase exponentially.

76.     Defendants represent that if consumers do not sign up for Defendants' services

that very day, this one-time opportunity will be lost forever.

77. Defendants then tell consumers that if they do not sign up for Defendants' services, the consumers' children and grandchildren will be saddled with ever-increasing annual maintenance fees in perpetuity.

78. This representation is false, as Defendants know. Consumers' heirs can always disclaim any interest in an inherited timeshare. They will not be liable for any timeshare-related fees unless and until they accept ownership of the timeshare.

79. Defendants' misrepresentation about consumers' heirs being responsible for timeshare fees is designed to induce fear and panic in consumers who are concerned with their heirs' financial well-being.

80. Defendants also claim that consumers cannot exit their timeshare contracts on their own and that paying for Defendants'' services is the only way consumers will be able to exit their timeshares.

81. Again, this is false. Consumers have other avenues by which to exit their timeshares.

82. Many timeshare developers have programs specifically designed to allow consumers to exit their timeshares at low, or even no cost. Consumers can take advantage of these services without ever engaging Defendants or any other third-party exit company.

83. However, as Defendants knew and understood, timeshare developers will not make their exit programs available to consumers who are working with third-party exit companies like Defendants.

84. Thus, not only are Defendants' services unnecessary, they actually impede consumers' ability to utilize timeshare developers low- or no-cost exit programs.

21

85.     By the end of the group presentation, consumers are desperate to hear how they can get out of their timeshares to prevent saddling their heirs with growing maintenance fees. On cue, Defendants then indicate they can get consumers out of their timeshares within a specified time, usually within one year.

86.     Defendants further represent that if they fail to secure the exit within the specified time, consumers will receive a full refund of Defendants' fee.

87.     This "100% money back guarantee" is also on Defendants' websites. *See* Figure 8.



*Figure 8*

88.     In truth, Defendants are rarely able to secure consumers' exits from their timeshares at all, let alone within a year.

89.     Despite their oft-represented "money back guarantee," Defendants consistently refuse to provide the promised full refunds to consumers even after failing to secure a timeshare exit within a year.

90.     Defendants also falsely represent that consumers can stop paying timeshare maintenance fees six months after purchasing Defendants' services.

91.     This representation is false. Consumers remain liable for all timeshare-related fees

22

Electronically Filed - Jefferson - June 09, 2022 - 11:40 AM

unless and until they no longer own their timeshare.

92.    In fact, consumers who stop paying their maintenance fees after six months (regardless of whether a true exit has been secured), are subject to severe consequences, including the timeshare developer sending their account to collections and their credit score being negatively impacted.

<strong><u>Defendants' Individual Sales Pitch</u></strong>

93.    After the group sales presentation, Defendants' salespeople descent on individual consumers to convince them to purchase Defendants' exit services.

94.    In these individual meetings, the salespeople reinforce what was said in the group presentation, telling consumers that the timeshare industry is hindering their ability to exit their timeshares and that their maintenance fees will soon skyrocket.

95.    Defendants' salespeople typically present consumers with a chart that purports to show the amount consumers' annual maintenance fees will increase over a thirty-year period.

96.    For example, Defendants provided one consumer with a chart showing that her $1,821 per year maintenance fee would balloon to $13,309 per year by year 30, and that she (and her children and grandchildren) would end up paying a total of $175,110 in maintenance fees. *See* Figure 9.



| MAINTENANCE FEE - INFLATION CALCULATOR | | |
|---|---|---|

Current Annual Maint. Fee: $1,700   Fee Inflation Rate @: 7.1%

| YEAR # | ANNUAL COST | CUMULATIVE COST |
|---|---|---|
| 1 | $1,821 | |
| 2 | $1,950 | $3,771 |
| 3 | $2,088 | $5,859 |
| 4 | $2,237 | $8,096 |
| 5 | $2,396 | $10,491 |
| 6 | $2,566 | $13,057 |
| 7 | $2,748 | $15,805 |
| 8 | $2,943 | $18,747 |
| 9 | $3,152 | $21,899 |
| 10 | $3,376 | $25,275 |
| 11 | $3,615 | $28,890 |
| 12 | $3,872 | $32,762 |
| 13 | $4,147 | $36,909 |
| 14 | $4,441 | $41,350 |
| 15 | $4,757 | $46,106 |
| 16 | $5,094 | $51,201 |
| 17 | $5,456 | $56,657 |
| 18 | $5,843 | $62,500 |
| 19 | $6,258 | $68,758 |
| 20 | $6,703 | $75,461 |
| 21 | $7,178 | $82,639 |
| 22 | $7,688 | $90,327 |
| 23 | $8,234 | $98,561 |
| 24 | $8,819 | $107,380 |
| 25 | $9,445 | $116,824 |
| 26 | $10,115 | $126,939 |
| 27 | $10,833 | $137,773 |
| 28 | $11,603 | $149,375 |
| 29 | $12,426 | $161,802 |
| 30 | $13,309 | $175,110 |

*Figure 9*

97.     This projection is not based on any actual facts. The 7.1% "inflation rate" is entirely made up. And there is no basis to believe the consumer's timeshare developer actually would charge those fees. Again, Defendants' representation is part of a scare tactic to cause the consumer to panic.

98.     After using the chart to demonstrate the enormous amount of maintenance fees consumers supposedly will pay going forward, Defendants' salespeople typically offer consumers three options: (1) do nothing and be stuck paying those fees in perpetuity; (2) convert their current timeshare into a new timeshare; or (3) purchase Defendants' timeshare exit services so they can get rid of the timeshare once and for all.

99.     Although Defendants provide no explanation as to how they calculate the costs of

24

those three options, they always portray the last option—exit—as the least expensive. *See* Figure

10. As a result, that is the option most consumers choose.



*Figure 10*

100.    At this point, Defendants finally tell consumers about the large upfront fee for

their services. Defendants' fee ranges from approximately $5,000 to over $80,000, depending on

the number of timeshares consumers are seeking to exit and Defendants' own (entirely

subjective) "valuation" of each timeshare.

101.    If consumers hesitate or indicate they are not interested in Defendants' services,

Defendants ratchet up the pressure.

102.    In some instances, for example, they tell consumers that if they walk out the door,

their opportunity to exit their timeshare will be lost forever.

103.    In other instances, they try to make consumers feel guilty by accusing them of

wasting Defendants' time and just coming for the free meal—despite their flyer promising that

25

attending the presentation would come with "no obligation."

104.    One consumer reported that Defendants' salesperson would not even allow her and her husband to excuse themselves to use the restroom at the same time because the salesperson did not want to give them the opportunity to leave.

105.    Another elderly consumer reported that when she tried to leave the presentation, Defendants' salesperson physically stood in her way to prevent her from leaving and would not let her out of the room until she signed a contract.

**Defendants' Contract and Cancellation**

106.    Consumers who are deceived into purchasing Defendants' services are then presented with a contract that reinforces Defendants' promise to secure consumers' exits from their timeshares, and to fully refund the upfront fee if Defendants fail to do so.

107.    As on their websites, Defendants falsely claim in their contracts that consumers can get a "100% money back guarantee" if they are not satisfied with Defendants' services.

108.    However, Defendants' contract does not itself notify consumers of their right to cancel the contract within three business days, nor do Defendants provide any type of alternative notice of a cancellation right.

109.    Defendants do not give consumers who sign their contract a receipt or copy of the contract informing them of their right to cancel the contract within three business days.

110.    Defendants do not give consumers a "Notice of Right to Cancel" or "Notice of Cancellation" that consumers can use to cancel their contract with Defendants.

111.    Nor do Defendants orally tell consumers that they have the right to cancel their contract within three business days of signing.

112.    In fact, Defendants falsely represent the opposite—they tell consumers that they have <u>no</u> right to cancel the contract, even within three days.

113.     Defendants' contracts affirmatively—and falsely—state: "This is a legally binding contract and does NOT have a cancellation period. By initialing here and signing below client acknowledges understanding of this statement."

114.     Consumers are required to immediately sign the contract at the sales presentation and to pay the Defendants' fee. They are not permitted to take the contract home to review it or to consult an attorney.

## THE "EXIT" PHASE

115.     In many instances, Defendants do not get consumers out of their timeshare contracts after they have promised to do so and have taken thousands (or tens of thousands) of dollars from them.

116.     As noted above, Defendants entered the timeshare exit business without a clear plan of how they actually would get consumers out of their timeshares.

117.     Defendants' business model was to act primarily as a sales force, generating massive revenues from unwitting consumers, and to then refer out those consumers' files to third-party vendors to handle the actual "exit" from the timeshare.

118.     Thus, at the time they initially sold their timeshare exit services, Defendants misrepresented their skill, experience, and ability to actually get consumers out of their timeshares.

119.     Defendants thus partnered with vendors based in Springfield, Missouri, and sent them the files for hundreds of consumers all over the country to be exited from their timeshares.

120.     However, the vendors Defendants chose did not actually perform any timeshare exit services for the consumers who paid Defendants thousands (or tens of thousands) of dollars to get them out of their timeshares.

121.     Defendants knew and understood that the vendors they had assigned consumers'

27

files to did not actually provide the services Defendants promised to perform when they took consumers' money.

122.    Defendants thus filed suit against their own vendors, admitting that these hundreds of consumers did not receive the services they paid for. *See Square One Development Group, Inc. v. CLS, Inc. et al.*, No. 19SL-CC04190 (Cir. Ct. St. Louis Cnty.).

123.    Despite knowing that these vendors were either unwilling or unable to get consumers out of their timeshares, Defendants did not issue refunds to the affected consumers.

124.    Defendants also continued soliciting new consumers, despite knowing they likely would not be able to successfully provide the timeshare exit services they promised.

125.    In 2019, Defendants stopped using vendors. Despite having no prior experience in the field, Defendants began performing timeshare exit services in-house. To oversee this operation, Defendants hired an ex-convict that George Reed had met in prison years earlier.

126.    Even after taking their operations in-house, Defendants failed to secure the exits they promised to hundreds if not thousands of consumers.

127.     Defendants maintain a call center in Missouri. When consumers call to check whether Defendants have gotten them out of their timeshare contracts, Defendants' employees tell them that their cases are "with legal," or that Defendants are trying to get them out of their timeshare contracts through litigation even when no lawsuit has been, or ever would be, filed on the consumers' behalf.

128.    After the onset of the COVID-19 pandemic, Defendants' employees began telling consumers that timeshare developers were closed down and that timeshare exits were on hold as a result.

129.    This was false. Even during the pandemic, timeshare developers were open and

willing to work directly with consumers to get out of timeshares, even during the pandemic.

130.    The only way the COVID-19 pandemic affected Defendants' ability to secure timeshare exits for consumers was that it cut down on Defendants' ability to host in-person sales presentations. This led to Defendants losing revenue, which led them to lay off staff that had been working on exit operations.

131.    Defendants actually secured millions of dollars in Paycheck Protection Program ("PPP") loans at the start of the pandemic. These PPP funds were intended to be used to pay employee salaries so that employees would not have to be laid off. Had Defendants used the PPP funds appropriately, they would not have had to lay off their in-house exit staff, and would have been better positioned to at least try to secure exits for more consumers.

132.    However, Defendants George Reed and Chris Carroll instead used the PPP funds to start a new trucking company and funnel over half a million dollars to themselves. Reed and Carroll are currently under indictment and awaiting trial on the PPP fraud charges.

133.    Defendants' representations about engaging in "litigation" on behalf of consumers also were false. On the rare instances when Defendants did, in fact, file lawsuits for consumers, those cases typically sought relief other than getting consumers out of their timeshare contracts.

134.    For example, Defendants hired counsel to file two mass actions on behalf of consumers, but the relief sought was an accounting, not for the consumers to be released from their timeshares. These were merely nuisance suits to serve as cover so that Defendants could represent to consumers that they were "taking legal action" on consumers' behalf.

135.    As a result of Defendants' tactics, many consumers attempt to cancel Defendants' services and obtain the refund that was promised that the time of purchase. But Defendants refuse to refund consumers who attempt to cancel, citing the contract's no cancellation clause set

29

out above.

136.    Even consumers who attempt to exercise their right to cancel the contract within three business days of signing are told they have no right to cancel. Defendants also refuse to refund consumers' payment within ten days of the receipt of a valid cancellation notice.

137.    Only in very rare cases will Defendants issue a refund—typically only if consumers sue them or enlist the help of state law enforcement to get a refund.

138.    In some instances, Defendants will claim they have transferred a consumer's timeshare when such "transfer" did not occur or was not legally binding.

139.    Consumers later (from their timeshare developers) that, contrary to Defendants' representations, they have not been exited from their timeshare at all, but in fact still own it and continue to accrue fees.

140.    Despite the ineffectiveness of the supposed "transfer," Defendants will claim they successfully exited the consumer from their timeshare and refuse to give a refund.

141.    In other instances, Defendants submit timeshare exit applications directly to timeshare companies while pretending to be the consumers themselves.

142.    When doing so, Defendants forge consumers' signatures on paperwork to conceal the fact that Defendants are actually submitting the exit request.

143.    Defendants do this because they know timeshare developers will not work with them, or any other third-party timeshare exit company.

144.    The forging of consumers' signatures—as opposed to signing for the consumers with a notation clarifying that Defendants have a Power of Attorney—is a crime.

145.    In order to further conceal their actions, Defendants instruct consumers not to have any direct contact with their timeshare companies and to deny that Defendants are involved

30

in the exit request if consumers are absolutely forced to speak with timeshare companies directly.

146.    As noted above, Defendants claim in their sales presentations and in their contracts that consumers will not have to pay timeshare maintenance fees beginning six months after engaging Defendants' services.

147.    Some consumers contact Defendants when six months have elapsed after signing their contract with Defendants.

148.    Defendants tell consumers, contrary to what their salespeople said in the presentation, that the consumers should continue paying the maintenance fees, and then submit proof of payment to Defendants, and Defendants will reimburse them for those payments.

149.    However, when consumers do pay the maintenance fees, Defendants do not actually reimburse the consumers as they promised they would.

## THE MISSOURI MERCHANDISING PRACTICES ACT

150.    The Missouri Merchandising Practices Act, §407.020 RSMo. provides in pertinent part:

> The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce or the solicitation of any funds for any charitable purpose, as defined in section 407.453, in or from the state of Missouri, is declared to be an unlawful practice…Any act, use or employment declared unlawful by this subsection violates this subsection whether committed before, during or after the sale, advertisement, or solicitation.

151.    "Advertisement" is defined as "the attempt by publication, dissemination, solicitation, circulation, or any other means to induce, directly or indirectly, any person to enter into any obligation or acquire any title or interest in any merchandise[.]" §407.010(1), RSMo.

152.    "Merchandise" is defined as "any objects, wares, goods, commodities, intangibles, real estate or services[.]" §407.010(4), RSMo.

31

153. "Person" is defined as "any natural person or his legal representative, partnership, firm, for-profit or not-for-profit corporation, whether domestic or foreign, company, foundation, trust, business entity or association, and any agent, employee, salesman, partner, officer, director, member, stockholder, associate, trustee or cestui que trust thereof." §407.010(5), RSMo.

154. "Sale" is defined as "any sale, lease, offer for sale or lease, or attempt to sell or lease merchandise for cash or on credit[.]" §407.010(6), RSMo.

155. "Trade" or "commerce" are defined as "the advertising, offering for sale, sale, or distribution, or any combination thereof, of any services and any property, tangible or intangible, real personal, or missed, and any other article, commodity, or thing of value wherever situated. The terms 'trade' and 'commerce' include any trade or commerce directly or indirectly affecting the people of this state[.]" §407.010(7), RSMo.

156. Defendants have advertised, marketed, and sold services in "trade" or "commerce" within the meaning of §407.010, RSMo.

157. Pursuant to §407.145, RSMo, the Attorney General has promulgated regulations explaining and defining terms in §§407.010-407.145 of the Merchandising Practices Act. The rules relevant to the Merchandising Practices Act allegations herein include the provisions of 15 CSR 60-8.010 to 60-9.110.

## COUNT I – FALSE PROMISES

158. Plaintiff incorporates Paragraphs 1–157 as if fully stated herein.

159. A false promise is "any statement or representation which is false or misleading as to the maker's intention or ability to perform a promise, or likelihood the promise will be performed." 15 CSR §60-9.060.

160. In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, and sale of their timeshare exit services, Defendants have made false promises

32

Electronically Filed - Jefferson - June 09, 2022 - 11:40 AM

to consumers, including:

        a.     Defendants will get consumers out of their timeshare contracts, typically within a specified time;

        b.     Consumers will recover 100% of their timeshare's purchase price;

        c.     Consumers will not have to pay timeshare-associated fees, or Defendants will repay any timeshare-associated fees consumers pay, more than six months after engaging Defendants' services; and

        d.     Defendants will refund consumers' purchase price if they fail to get consumers out of their timeshare contracts within the specified time.

161.    Defendants' promises are false and/or misleading as to Defendants' intention or ability to perform such promises, or the likelihood such promises will be performed.

162.    Defendants' false promises thus violate §407.020(1), RSMo.

## COUNT II – MISREPRESENTATION

163.    Plaintiff incorporates Paragraphs 1–162 as if fully stated herein.

164.    "A misrepresentation is an assertion that is not in accord with the facts." 15 CSR §60-9.070.

165.    In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, and sale of their timeshare exit services, Defendants represent or have represented, directly or indirectly, expressly or by implication that:

    a.  Defendants have experience and/or expertise in successfully exiting consumers from their timeshares;

    b.  Consumers will be able to recover 100% of their timeshare's value if they retain Defendants' services;

    c.  Defendants are accredited by Consumer Rights Council;

33

d. Defendant Consumer Law Protection is a law firm;

e. Defendants will refund 100% of the fees consumers paid them if Defendants do not successfully get consumers out of their timeshare within a year;

f. Consumers do not need to pay timeshare-associated fees starting six months after they retain Defendants' services (or that Defendants will reimburse consumers for any fees they pay after that time);

g. Timeshare companies will not work with consumers directly to help them exit their timeshares;

h. Consumers' children and grandchildren will be burdened with timeshare fees after consumers' deaths;

i. Consumer Law Protection is a law firm and will provide legal services;

j. The FTC's three-day Cooling Off Rule does not apply to Defendants' services or contracts;

k. Defendants are representatives of, otherwise affiliated with, or accredited by RCI, LLC, Interval International, Wyndham Destinations, Bluegreen Vacations Unlimited, Inc., the American Resort Development Association, and the Better Business Bureau;

l. Defendants have sent consumers' files to "legal," that consumers' cases are in litigation, and/or that Defendants have made actual efforts to get consumers out of their timeshare contracts; and,

m. Defendants have filed or will file lawsuits on consumers' behalf designed to or which could result in consumers getting out of their timeshares.

166. These and other representations made by Defendants are not in accord with the facts and thus violate §407.020(1), RSMo.

## COUNT III – CONCEALMENT, SUPPRESSION, OR OMISSION

167.    Plaintiff incorporates Paragraphs 1–166 as if fully stated herein.

168.    A "material fact" is "any fact which a reasonable consumer would likely consider to be important in making a purchasing decision, or which would be likely to induce a person to manifest his/her assent, or which would be likely to induce a reasonable consumer to act, respond or change his/her behavior in any substantial manner." 15 CSR 60-9.010.

169.    "Concealment of a material fact is any method, act, use or practice which operates to hide or keep material facts from consumers." 15 CSR 60-9.110(1).

170.    "Suppression of a material fact is any method, act, use or practice which is likely to curtail or reduce the ability of consumers to take notice of material facts which are stated." 15 CSR 60-9.110(2).

171.    "Omission of a material fact is any failure by a person to disclose material facts known to him/her, or upon reasonable inquiry would be known to him/her" 15 CSR 60-9.110(3).

172.    In connection with the advertising, marketing, promotion, offering for sale, and sale of their timeshare exit services, Defendants concealed, suppressed, and/or omitted from consumers numerous material facts, including that:

a.    Many timeshare companies have programs to let consumers exit from their timeshares at no or low cost to the consumer;

b.    Many timeshare companies will work with consumers directly, but will not work with third-party exit companies like Defendants;

c.    States allow heirs to disclaim timeshares even upon inheritance, meaning that consumers children and grandchildren would not be obligated to pay timeshare-related fees unless and until they accepted the timeshare;

d.    That Consumer Rights Council was actually owned by Defendants and created

35

specifically to allow Defendants to claim said accreditation; and,

    e.   Consumers have three days to cancel their contracts with Defendants, per the FTC's

        three-day Cooling Off Rule.

    173.   The foregoing facts all were known to Defendants, or were easily ascertainable by

them, at the time Defendants omitted them.

    174.   Defendants' concealment, suppression, and omission of such material facts

violated §407.020, RSMo.

## COUNT IV - DECEPTION

    175.   Plaintiff incorporates Paragraphs 1–174 as if fully stated herein.

    176.   "Deception is any method, act, use, practice, advertisement or solicitation that has

the tendency or capacity to mislead, deceive or cheat, or that tends to create a false impression."

15 CSR §60-0.020.

    177.   In connection with the advertising, marketing, promotion, offering for sale, and

sale of their timeshare exit services, Defendants have used deceptive methods, acts, practices,

and statements, including:

    a.   Implying that they have been engaged in the "property services" industry since 2005,

        and that they had "expertise" in the timeshare exit industry, when in fact they had no

        experience or knowledge with respect to timeshare exits before 2018;

    b.   Claiming that consumers would be able to recover "100%" of their timeshare's

        purchase price, when in fact consumers would not be able to recover any of the

        purchase price;

    c.   Claiming to be "accredited" by Consumer Rights Council, when such accreditation

        was specious because Consumer Rights Council was owned and operated by

        Defendants themselves;

d.  Claiming that the only way consumers could exit timeshares was by purchasing Defendants' services, when in fact many timeshare companies have programs that will allow consumers to exit their timeshares without third-party exit services;

e.  Offering a "100% money back guarantee" if they could not get consumers out of their timeshares within a year, when Defendants had no intention of actually providing such refund;

f.  Convincing consumers that if they did not purchase Defendants' services on the very day of the in-person presentation, consumers would forever lose the opportunity to exit their timeshares;

g.  Claiming that consumers' children and grandchildren would be saddled with unwanted timeshare-related fees upon the consumers' deaths, when in fact the consumers' heirs would not incur timeshare fees unless they accepted the timeshare;

h.  Claiming that timeshare maintenance fees would increase every year, when they had no factual basis for making that representation;

i.  Failing to advise consumers that they had a three-day "Cooling Off" window in which to cancel their contracts with Defendants, and affirmatively claiming that the FTC's Cooling Off Rule did not apply to Defendants' contracts and services;

j.  Claiming that consumers were successfully exited from their timeshares after performing "sham transfers," which Defendants knew were not accepted by timeshare companies and thus legally ineffective; and,

k.  Filing sham lawsuits designed to make consumers believe their timeshares were the subject of litigation to secure an exit, when in fact Defendants never filed any lawsuit that, if successful, would release a consumer from their timeshare.

37

178.     These deceptive acts, practices, methods, and statements violated §407.020, RSMo.

## COUNT V – UNFAIR PRACTICE

179.     Plaintiff incorporates Paragraphs 1–178 as if fully stated herein.

180.     "It is an unfair practice for any person in connection with the sale of merchandise to unilaterally breach unambiguous provisions of consumer contracts[.]" 15 CSR §60-8.070.

181.     In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, and sale of their timeshare exit services, Defendants unilaterally breached unambiguous provisions of consumer contracts in that Defendants failed to secure consumers' exits from their timeshare contracts as promised, yet have refused to refund fees Defendants charged for that service.

182.     Defendants' unilateral breach of unambiguous provisions of the contract are an unfair practice and thus violated §407.020(1), RSMo.

## COUNT VI – UNFAIR PRACTICE

183.     Plaintiff incorporates Paragraphs 1–182 as if fully stated herein.

184.     An unfair practice is any practice which—

(A) Either –

1. Offends any public policy as it has been established by … the Federal Trade Commission, or its interpretive decisions; or

2. Is unethical, oppressive or unscrupulous; and

(B) Presents a risk of, or causes, substantial injury to consumers.

15 CSR §60-8.020.

185.     In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, and sale of their timeshare exit services, in connection with the sales of their

38

timeshare exit services, Defendants have:

a. Failed to furnish buyers with a receipt or contract informing them of their right to cancel the transaction within three business days, in violation of 16 C.F.R. §429.1(a);

b. Failed to furnish buyers with a "NOTICE OF CANCELLATION" or "NOTICE OF RIGHT TO CANCEL" in duplicate, that buyers can use to cancel the transaction, in violation of 16 C.F.R. §429.1(b) and (c);

c. Included in buyers' contracts a waiver of the rights they are entitled to under the Cooling-Off Rule, in violation of 16 C.F.R. §429.1(d);

d. Failed to orally inform buyers of their right to cancel the transaction, in violation of 16 C.F.R. §429.1(e);

e. Misrepresented to buyers their right to cancel, in violation of 16 C.F.R. §429.1(f); and

f. Failed to honor valid notices of cancellation and within 10 business days after the receipt of such notice by refunding to buyers all payments made under the contract, in violation of 16 C.F.R. §429.1(g).

186. Such practices (i) offend public policy as established by the Federal Trade Commission, is unethical, oppressive or unscrupulous, and present a risk of, or caused, substantial injury to consumers.

187. Defendants' practices thus are unfair practices that violate §407.020(1), RSMo.

## COUNT VII – UNFAIR PRACTICE

188. Plaintiff incorporates Paragraphs 1–187 as if fully stated herein.

189. "It is an unfair practice for any person in connection with the sale of merchandise to engage in any unconscionable act or practice, or to use any unconscionable contract or contract term." 15 CSR §60-8.080(1).

190. "It is unconscionable to take advantage of an unequal bargaining position and

39

obtain a contract or term which results in a gross disparity of values exchanged." 15 CSR §60-8.080(2).

191.     In many instances, in connection with the advertising, marketing, promotion, offering for sale, and sale of their timeshare exit services, Defendants have charged consumers thousands (or tens of thousands) of dollars for services that timeshare companies would have provided consumers with for low or even no cost.

192.     Defendants did so despite knowing that timeshare companies would have allowed consumers to exit their timeshares at low or no cost, but that the same timeshare companies would not allow a timeshare exit when Defendants were involved in trying to obtain the exit.

193.     Defendants' charging consumers thousands (or tens of thousands) of dollars for a result the consumers could have obtained for a fraction of that cost (or for free) is an unfair practice and violates §407.020, RSMo.

## COUNT VIII – UNFAIR PRACTICE

194.     Plaintiff incorporates Paragraphs 1–193 as if fully stated herein.

195.     "It is an unfair practice for any person in connection with the advertisement or sale of merchandise to use or employ any duress, or undue influence." 15 CSR §60-8.050.

196.     In connection with the advertising, marketing, promotion, offering for sale, and sale of their timeshare exit services, Defendants have employed duress or undue influence, including by:

   a.  Using "scare tactics" designed to intimidate consumers into signing Defendants' contracts;

   b.  Falsely telling consumers that if they do not sign a contract with Defendants immediately, they will forever lose the ability to exit their timeshare, and will be forced to pay tens or hundreds of thousands of dollars' worth of ever-escalating

maintenance fees;

c. Falsely telling consumers that if they do not purchase Defendants' services, the consumers will saddle their children and grandchildren with tens or hundreds of thousands of dollars' worth of ever-escalating maintenance fees; and,

d. Physically preventing consumers from leaving Defendants' in-person presentations unless they purchase Defendants' services then and there.

197. Defendants' use of duress and undue influence is an unfair practice and violates §407.020, RSMo.

## COUNT IX – PRELIMINARY INJUNCTION

198. Plaintiff incorporates Paragraphs 1–197 as if fully stated herein.

199. Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendants' violations of the Missouri Merchandising Practices Act as well as the FTC three-day Cooling Off Rule. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

200. Absent a preliminary injunction, consumers across the country are likely to suffer irreparable harm due to Defendants' illegal acts as alleged herein.

201. Plaintiff is likely to succeed on the merits of its claims against Defendants.

202. Consumers are likely to be far more harmed if injunctive relief is not awarded than Defendants will be harmed if injunctive relief is awarded.

203. The public interest weighs in favor of a preliminary injunction.

## COUNT X – PERMANENT INJUNCTION

204. Plaintiff incorporates Paragraphs 1–203 as if fully stated herein.

205. Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendants' violations of the Missouri Merchandising Practices Act as well

41

as the FTC three-day Cooling Off Rule. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

206.     Absent a preliminary injunction, consumers across the country are likely to suffer irreparable harm due to Defendants' illegal acts as alleged herein.

207.     Plaintiff is likely to succeed on the merits of its claims against Defendants.

208.     Consumers are likely to be far more harmed if injunctive relief is not awarded than Defendants will be harmed if injunctive relief is awarded.

209.     The public interest weighs in favor of a permanent injunction.

## COUNT XI – FRAUDULENT TRANSFER

210.     Plaintiff incorporates Paragraphs 1–209 as if fully stated herein.

211.     Per §428.024.1, "[a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation … [w]ithout receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor (a) [w]as engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (b) [i]ntended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due."

212.     In 2020, SOG applied for a PPP loan, which was granted on May 1, 2020.

213.     In the same time frame, Defendants George Reed and Christopher Carroll decided to open a separate trucking business, and established the Transfer Defendants (Whiskey Dix, SO Transport, and SO Logistics) for that purpose.

214.     Reed and Carroll directed SOG to use the proceeds of its PPP loan—which was intended to pay for company payroll and rent/utilities—for capital investments in the new

42

trucking-related businesses.

215.     On May 15, 2020, Reed used $354,550.00 from SOG's bank account to purchase trucks for the Transfer Defendants.

216.     On May 22, 2020, Carroll and Reed used $563,035.00 from SOG's account to purchase more trucks for the Transfer Defendants.

217.     On May 26, 2020, Carroll and Reed used $140,000.00 from SOG's account to purchase trailers for the Transfer Defendants.

218.     On June 4, 2020, Carroll and Reed used $27,153.58 from SOG's account to purchase another truck for the Transfer Defendants.

219.     On June 5, 2020, Carroll and Reed used $42,000.00 from SOG's account to purchase another truck for the Transfer Defendants.

220.     On June 11, 2020, Carroll and Reed used $698,683.29 from SOG's account to purchase land used for the Transfer Defendants' headquarters.

221.     On June 19, 2020, Carroll and Reed used $32,025.00 from SOG's account to purchase two more trucks for the Transfer Defendants.

222.     On information and belief, SOG did not receive a reasonably equivalent value in exchange for such transfers.

223.     George Reed and Christopher Carroll controlled SOG with respect to the above transactions, and are responsible for such transfers being made.

224.     On information and belief, Reed, Carroll, and SOG believed, or reasonably should have believed, they would incur debts beyond their ability to pay as such debts became due.

225.     The foregoing transfers to the Transfer Defendants are therefore fraudulent transfers under §428.024.1.

## **NOTICE OF INTENT TO SEEK PUNITIVE DAMAGES**

226.    Per §510.261(5), Plaintiff does not include a claim for punitive damages in this Petition. Plaintiff hereby gives notice, however, of its intent to seek leave to amend its Petition after discovery has been conducted to add a claim for punitive damages against Defendants.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiffs request that the Court:

A.    Award such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief, including but not limited to, temporary and preliminary injunctions, and an order providing for the freezing of assets and the restraint of the practices alleged herein that violate the Missouri Merchandising Practices Act;

B.    Enter a permanent injunction to prevent future violations of the Missouri Merchandising Practices Act by Defendants;

C.    Find that the alleged transfers to the Transfer Defendants were fraudulent transfers, and Order that such transfers be set aside and returned to the transferee Defendants;

D.    Award monetary and other relief within the Court's power to grant, including restitution to all of Defendant's consumer victims under §407.100.4, RSMo., plus ten (10%) of any restitution awarded to be paid into the Missouri Merchandising Practices Revolving Fund under §407.140.3, RSMo., civil penalties of $1,000.00 per violation of §407.100.6, RSMo., and the State of Missouri's costs in investigating and prosecuting this action under § 407.130, RSMo.; and,

E.    Award any additional relief as the Court may determine to be just and proper.


Dated: June 9, 2022                     Respectfully Submitted,

ERIC S. SCHMITT
Attorney General

*/s/ Stephen M. Hoeplinger*
Stephen M. Hoeplinger, #62384
Assistant Attorney General
815 Olive Street, Suite 200
St. Louis, MO 63101
P: (314) 340-7849
F: (314) 340-7981
Stephen.Hoeplinger@ago.mo.gov

John W. Grantham, #60556
Assistant Attorney General
P.O. Box 899
Jefferson City, Missouri 65102
P: (573) 751-3942
F: (573) 751-7948
John.grantham@ago.mo.gov

*Attorneys for Plaintiff*

45